**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:21-cr-606 (RCL)** |
| **v.** | : | |
| | : | |
| **GARY LAIRD WICKERSHAM,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Gary Wickersham to four months of home detention, a three-year term of probation, sixty hours of community service, and $500 in restitution.

## I. INTRODUCTION

The defendant, Gary Laird Wickersham, an 81-year-old Army veteran, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and resulted in more than one million dollars of property damage.

On October 15, 2021, Gary Laird Wickersham pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. ECF Minute Entry entered October 15, 2021. As explained herein, a sentence of home detention is appropriate in this case because (1) Wickersham was among the first people to reach the Capitol by ascending the staircase near the NW Scaffolding seconds after the police line there was breached; (2)

Wickersham was among the first people to breach the Capitol via the Senate Wing Door, entering not long after other Capitol rioters Douglas Jensen (21-CR-06 (TJK)), Aaron Mostofsky (21-CR-138 (JEB)), and Jacob Chansley (21-CR-03 (RCL))—a rioter that this Court recently sentenced to 41 months incarceration; (3) the defendant is seen speaking with a law enforcement officer, swiping away—and possibly making physical contact with the officer's arm while on the front line of rioters in the Crypt; (4) when defendant exited the Capitol through the door that leads to the Capitol's Upper West Terrace, he held it open for other rioters to enter and pointed back inside; (5) approximately five days after the riot, defendant told an FBI agent that he believed that his presence in the Capitol was justified given his status as a taxpayer and that the whole things was a setup by antifa; and (6) during that same interview, Wickersham admitted that he saw the rioters committing acts of violence against law enforcement officers, but still he went into and through the Capitol.

These aggravating factors and the totality of Wickersham's actions place him in the range of defendants for whom the government has recommended incarceration. The government does not do so here considering the defendant's age, the defendant's complete lack of contacts with the criminal justice system throughout his long life, and the fact that the defendant appears to have accepted responsibility for his actions.

The government has no reason to believe that any evidence shows the defendant personally engaging in violence or property destruction before, during, or after the riot. It is important to note, however, that if such evidence existed, the government likely would have presented felony charges to a Grand Jury. The government does not believe that a defendant's failure to engage in violent or destructive acts is a mitigating factor in misdemeanor cases. While a Facebook account exists

for the defendant, the defendant disavowed posting anything regarding the attack on the Capitol to Facebook, and the government was unable to find any evidence to contradict that claim.

Nonetheless, the government asks this Court to consider the reality that this defendant's conduct on January 6 took was part of a large and violent riot that succeeded in disrupting—albeit temporarily—Congress' certification of the Electoral College's vote. The rioters achieved their goal of breaching the Capitol and disrupting the proceedings in large part due to the sheer number of rioters. While the exact number of rioters to attach the Capitol and breach its doors are not known at this time, the number was sufficient to overwhelm law enforcement and sully the nation's track record for a peaceful transition of power.

The defendant participated in a riot that succeeded in halting the Congressional certification of a Presidential election. This combined with the reality that the defendant entered the Capitol within sixty seconds of the initial breach and that defendant can be seen confronting law enforcement officers in the Crypt shortly before law enforcement were overwhelmed renders a sentence of home detention sufficient but not greater than necessary to achieve the purposes set forth in 18 U.S.C. § 3553(a). The facts specific to this defendant also show this Court why a sentence of probation only is insufficient in this case.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

### a.  The January 6, 2021 Attack on the Capitol

For a general summary of the attack on the Capitol, the government relies on the paragraphs 1-7 of the previously filed Statement of Offense. ECF No. 15. As this Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent—contributed to the violence and destruction of that day in both direct and indirect ways.

### b.  Gary Laird Wickersham's Role in the January 6, 2021 Attack on the Capitol

On January 6, 2021, Gary Laird Wickersham traveled to Washington, D.C., from his home in West Chester, Pennsylvania, to attend the "Stop the Steal" rally. The defendant claims to have attended former president Donald John Trump's remarks on the Ellipse in the morning, but before Trump's speech ended, Wickersham walked with many other rioters down Pennsylvania Avenue NW, up the Pennsylvania Walkway, and to the Lower West Plaza.[1] As seen by USCP surveillance screenshots, at approximately 2:06 PM and 2:07 PM, when Wickersham was likely making his way from the Ellipse to the Capitol, Pennsylvania Ave NW and the West Front of the Capitol appeared as follows:

**[THIS SPACE INTENTIONALLY LEFT BLANK]**

---

[1] The government encourages the Court to use Attachment 1, a map created by @ne0ndistraction and @sansastark525 and publicly available at https://jan6attack.com/maps.htm, for bearings as the government references various locations where Wickersham is known to have traveled.



*IMAGE 1*—*A screenshot from USCP surveillance showing a corner of the Capitol Reflecting Pool and Pennsylvania Ave NW at approximately 2:06 PM on January 6, 2021.*



*IMAGE 2*—*A screenshot from USCP surveillance showing the Inaugural Stage, the Upper West Plaza, and the Lower West Plaza at approximately 2:07 PM on January 6, 2021.*

One of the key breaches that allowed rioters access to the immediate vicinity of the Capitol was the one that occurred under and around the NW Scaffolding at approximately 2:09:45 PM. Wickersham can be seen via USCP surveillance just fifteen seconds after the breach.



***IMAGE 3***—*A screenshot from USCP surveillance showing Wickersham walking up the NW Steps toward the Upper West Terrace and NW Courtyard at approximately 2:10:00 PM on January 6, 2021.*



***IMAGE 4***—*A screenshot from USCP surveillance showing Wickersham walking through the NW Courtyard and towards the Senate Wing Doors at approximately 2:12 PM on January 6, 2021.*

At approximately 2:13 PM, the first known rioter to enter the Capitol on January 6 entered through a window next to the Senate Wing Door (a door that leads to a north-south running first-floor hallway connecting the Crypt to the Brumidi Corridors). At approximately 2:13:56 PM, Wickersham walked through the Senate Wing Door.

 

*IMAGE 5 and 5a—A screenshot from USCP surveillance showing Wickersham walking through the Senate Wing Door at approximately 2:13:56 PM on January 6, 2021.*

After entering the Capitol, Wickersham took an immediate right and went south towards the Crypt. In the Crypt, at approximately 2:15 PM, Wickersham engaged in some of his most troubling behavior, specifically, as seen in Image 6 below, Wickersham approached members of law enforcement and appears to have pushed away the arm of one who was pointing back towards the exit.

 

**IMAGE 6** and **6a**—A screenshot from USCP surveillance showing Wickersham confronting a law enforcement officer at approximately 2:15 PM on January 6, 2021.

 

**IMAGE 7** and **7a**—A screenshot from USCP surveillance showing Wickersham appearing to swipe at the arm of a law enforcement officer, a gesture that may have resulted in physical contact while at the Crypt's north door at approximately 2:15 PM.




*IMAGE 8* and *8a*—*After the encounter pictured in IMAGE 6, the law enforcement officers pushed the crowd back. A short time later, the crowd surged forward and began to fill the Crypt. The defendant also reentered the Crypt and engaged with a different law enforcement officer, as pictured above, at approximately 2:17 PM.*



*IMAGE 9*—*Wickersham is seen standing with law enforcement in front of a rapidly growing number of rioters. This screenshot is taken from a video filmed by fellow Capitol riot defendant Samuel Montoya (21-CR-336 (JDB)).*



*IMAGE 10 and 11 (top to bottom)—Two screenshots from surveillance video inside the Crypt showing the dramatic difference between 2:24:52 PM—immediately before the police line was breached—and just thirty seconds later when hundreds of rioters flood the Crypt and subsequently other areas of the Capitol.*





**IMAGE 12** and **13** (top to bottom)—Two screenshots from surveillance video inside the Crypt showing the dramatic difference between 2:24:52 PM—immediately before the police line was breached—and fifty seconds later when hundreds of rioters flood the Crypt and subsequently other areas of the Capitol.

Wickersham is again captured on surveillance at approximately 2:33 PM. During his non-custodial interview with the FBI, Wickersham indicated that he walked by Congressman Steny Hoyer's office. This, if true, means that Wickersham walked from the Crypt down the SW Entry Corridor before doubling back and going down the hallway pictured below. This hallway leads west from the Small House Rotunda past offices to a perpendicular hallway that in turn leads to the Upper West Terrace door and stairway up to the Rotunda.



 

*IMAGE 14, 15, and 15a (top to bottom, l to r)—Two screenshots from surveillance video inside the Capitol showing Wickersham walking west away from the Small House Rotunda and towards the Upper West Terrace exit.*

From there, Wickersham arrived at a junction where if he had gone right, up the staircase, he would have entered the Capitol Rotunda. Wickersham instead turned left, and again stopped to speak with a law enforcement officer at approximately 2:34 PM.



*IMAGE 16—Prior to exiting, Wickersham stopped to speak with law enforcement officers once again.*

**[THIS SPACE INTENTIONALLY LEFT BLANK]**

At approximately 2:35 PM, Wickersham exited the Capitol. He did so via the Upper West Terrace door—a fire door that leads to the Upper West Terrace. After exiting the Capitol, the defendant turned, spoke to an unidentified female, and pointed back inside the Capitol.






*IMAGE 17—Wickersham leaves the Capitol through the Upper West Terrace door at 2:35 PM, after spending approximately twenty-two minutes inside the Capitol.*

On January 15, 2021, FBI agents, interviewed Wickersham at his home in West Chester, Pennsylvania. During the non-custodial interview, the defendant admitted that he traveled to Washington, D.C., by bus to attend a rally with other supporters of former president Trump. The defendant further stated that he attended Trump's speech and then marched to the U.S. Capitol where he observed others cursing, screaming, knocking cops away, breaking windows and doors, and entering the Capitol. The defendant stated that he believes that many of the protesters were members of Antifa. The defendant stated that he was wearing a leather jacket, blue jeans, and a white baseball hat with a blue rim.

The defendant stated that he entered the U.S. Capitol and remained inside for approximately ten to fifteen minutes. While he was inside, the defendant described seeing protestors and police officers involved in what he termed a "rugby scrum" in what was likely the Capitol Crypt. The defendant further stated that he walked by many offices, including that of Congressman Stenny Hoyer. The defendant stated that he believed that he was authorized to enter the Capitol because he pays his taxes. The defendant believes that the entire event was staged, and that law enforcement purposefully did not have enough resources there so that supporters of the former president could overrun the Capitol and be subsequently labeled as "intruders."

The defendant was identified after acquaintances of Wickersham submitted Wickersham's information to the FBI through the public tip line. The acquaintances claimed that Wickersham texted them from inside the Capitol.

### c. The Charges and Plea Agreement

On May 7, 2021, Gary Laird Wickersham was charged by complaint with violating 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). On May 11, 2021, Wickersham, who had retained counsel, self-surrendered to the FBI in Pennsylvania. On September 30, 2021, Gary Laird Wickersham was charged by four-

count Information with 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D), and 40 U.S.C. § 5104(e)(2)(G). On October 15, 2021, he plead guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in a Capitol Building. By plea agreement, Gary Laird Wickersham agreed to pay $500 in restitution to the Department of the Treasury.

### d. Statutory Penalties

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

## III.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, 18 U.S.C. § 3553(a) guides the sentencing considerations and identifies the factors a court must consider in formulating the defendant's sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). In this case, as described below, all the Section 3553(a) factors weigh in favor of a term of home detention.

### a.   The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the Capitol—the seat of our representative democracy—was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under extreme circumstances. By the time they entered the Capitol, they—at a minimum—crossed through numerous barriers and barricades and heard the shouts and exclamations the mob. Depending on the timing and location of their approach, they also may have observed fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a "mere tourist" that day.

Additionally, while looking at the defendants' individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum, should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment. Had the defendant

personally engaged in violence or destruction, he or she would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases.

Unlike many other Capitol defendants and subjects, Wickersham maintained a low-profile on social media and had inactive or no accounts on many of the more common social media providers. Wickersham, clarified his justification for his behavior while speaking in a pre-arrest, non-custodial capacity to FBI agents. He claimed that he was authorized to enter the Capitol because he pays his taxes. He claimed that the entire event was staged, and that law enforcement purposefully did not have enough resources there so that supporters of the former president could overrun the Capitol and be subsequently labeled as "intruders." As part of the Statement of Offense, Wickersham agreed that he went to Washington, D.C., to protest the result of the November 3, 2020, Presidential Election.

Wickersham did not wait at the back of the crowd and amble in after the infantrymen cleared the way. Wickersham placed himself at the front of the pack. He was only seconds behind the most violent actors who breached the police lines at the NW Scaffolding. He admitted to seeing rioters engaged in violent acts against law enforcement. He was among the first of what would become thousands to unlawfully enter the Capitol. Once inside, Wickersham was again on the front line of the rioters as he directly spoke to, argued with, and stood on the front line of the rioters against law enforcement. After that, and for reasons known only to Wickersham, he left the Capitol through a door leading out onto the Upper West Terrace. As his final act of defiance while leaving the Capitol, Wickersham—in a gesture that in any other context could be categorized as courteous—held open for other rioters an exterior door to the Capitol and pointed the way inside.

As an Army veteran, Wickersham was aware of the jeopardy posed by violent entry into the Capitol by the rioters and Wickersham was also aware of the violence required to make that entry into the Capitol. While in the Crypt, Wickersham was undeterred by other rioters shouting, chanting, and fronting up against law enforcement. Instead, Wickersham continued even further into the Capitol until he—seemingly inadvertently—found an exit and walked out.

Accordingly, the nature and the circumstances of this offense establish the clear need for a period of home detention in this matter.

**b.  The History and Characteristics of the Defendant**

As set forth in the draft PSR, Gary Laird Wickersham's criminal history is completely empty. He has no juvenile adjudications, adult criminal convictions; traffic infractions, excluded convictions; or other criminal conduct, pending charges, or arrests.

As to his military service, Wickersham reported to the PSR writer that he enlisted in the U.S. Army in 1962 and was trained at artillery school and jump school. Wickersham was stationed in Germany for twenty-nine months during the Vietnam War, but never deployed to Vietnam. Wickersham was honorably discharged in 1965. Wickersham continued to serve in the Army Reserves until 1968.

Except for his time in the military, Wickersham spent his life in eastern Pennsylvania. He worked as a machine operator at Scott Paper for thirty-five years and then as a school bus driver for another seventeen years. He is now retired.

Wickersham's military service is laudable by any measure. As a former military member, however, Wickersham is well aware that taxpayer status does not bestow upon a person the right to enter restricted government buildings, and certainly not using the violent methods of entry deployed by the rioters on January 6. He made a deliberate decision to voluntarily storm a guarded government building, and his repeated assertions that he had a right to enter based on paying taxes

is not credible. Certainly, as an active service member he did not or would not have allowed civilians onto restricted military bases on the basis that they "paid taxes." In this case, Wickersham's former military service undercuts his purported justifications for his actions.

### c. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. "The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and appalling disregard for our institutions of government and the orderly administration of the democratic process."[2] As with the nature and circumstances of the offense, this factor supports a sentence of home detention, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually—should be expected") (statement of Judge Hogan).

### d. The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

---

[2] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight and Reform Committee (June 15, 2021), available at https://oversight.house.gov/sites/democrats.oversight. house.gov/files/Wray%20Testimony.pdf

Even though the government is recommending home detention in this case, general deterrence weighs in favor of incarceration, as it does for nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. The violence at the Capitol on January 6 was cultivated to and did interfere with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—

especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

The government acknowledges that Wickersham has no convictions, arrests, or even traffic tickets, and that he accepted responsibility early by entering into this plea agreement. A sentence of only probation, however, is not justified in this case given Wickersham's justifications for his actions and given his proximity to violent individuals and presence on the front line of the rioters during at least three key moments—the breach of the police line at the NW Scaffolding, the violent entry into the Capitol through the Senate Wing Door and the broken-out windows to its left and right, and the breach of the police line in the Crypt. While the government would otherwise be inclined to recommend a sentence of imprisonment, given Wickersham's age and limited presence on social media, the government believes that a term of home detention satisfies the need for specific deterrence.

### e.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this assault on the Capitol, ranging from misdemeanor charges (such as in this case), to charges of assault on law enforcement officers and conspiracy to corruptly interfere with Congress.[3] Certainly each offender must be sentenced based on their individual circumstances, but this Court should always keep the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a term of home detention—or exceedingly rarely, probation only—to crimes necessitating years of imprisonment. The

---

[3] Attached to this supplemental sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021, *were not* minor crimes. A probationary sentence should not become the default.[4] Indeed, it was this Court that previously stated, "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

The government and the sentencing courts have already begun to make meaningful distinctions between offenders. Those who engaged in felonious conduct are generally more dangerous, and thus, treated more severely in terms of their conduct and subsequent punishment. Those who trespassed, but engaged in aggravating factors, merit serious consideration of institutional incarceration. Those who trespassed, but engaged in less serious aggravating factors, deserve a sentence more in line with minor incarceration or home detention.

The defendant plead guilty to Count Four of the Information, charging him with parading, demonstrating, or picketing in a Capitol Building, a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and

---

[4] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation, including in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); and *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many considerations help in understanding the differing recommendations and sentences. These considerations include how a defendant entered the Capitol, how long they remained inside, the nature of any statements they made (on social media or otherwise), whether they destroyed evidence of his participation in the breach, etc. And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement. *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

Moreover, assessing disparities, and whether they are unwarranted, requires a sufficient pool of comparators. In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id*.; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders

similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of the legislative branch of the federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and the large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's age and previously nondescript life.

The sentences imposed in previously sentenced cases involving the events of January 6 demonstrate that a probation-only sentence in this case would create a disparity with others. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the Court government suggests that the Court consider the sentence imposed on

Joshua Bustle for reference. Bustle's case did not involve the aggravating conduct present here and he was sentenced to one month of home detention. *U.S. v. Bustle et al*, Crim. No. 21-CR-238 (TFH)(D.D.C.), ECF No. 44. As described by the government in its sentencing memorandum in that case, Joshua Bustle and his co-defendant walked through the East Rotunda Door approximately thirty minutes after the initial breach of that door, remained inside for twenty minutes, and then left when law enforcement officers cleared the Rotunda. *Id.* at ECF No. 38, p. 2. It further appears that Bustle did not make any aggravating statements and was not in close temporal or spatial proximity to any breaches of the Capitol or police lines.

In this case, Wickersham was present for—or seconds behind—*three* significant breaches of the Capitol or police lines, and he had several encounters with law enforcement before leaving. Bustle was sentenced to thirty days home detention, twenty-four months probation, forty hours community service, and $500 restitution. Given Wickersham's proximity to and participation in three key events of the January 6 Capitol riots, the government believes that an additional period of home detention is sufficient but not greater than necessary to achieve the objectives listed above.

The government asks this Court to also consider the sentences imposed on Capitol rioters and defendants Derek Jancart and Erik Rau, both of whom were sentenced to forty-five days incarceration following a plea of guilty to a different subsection of the same statute to which defendant Wickersham plead guilty, specifically 40 U.S.C. § 5104(e)(2). *See U.S. v. Rau*, Crim. No. 21-CR-467 (JEB)(D.D.C.), ECF No. 21; *U.S. v. Jancart*, Crim. No. 21-CR-148 (JEB)(D.D.C.), ECF No. 33. In those cases, there is no indication that these defendants were in close spatial or temporal proximity to the breach of the police line, nor did they enter the Capitol within a minute of the first rioters as Wickersham did. According to the sentencing memo filed in *Rau*, "Exactly five minutes after the [initial breach of the Senate Wing Door], Rau and Jancart

entered the U.S. Capitol." *U.S. v. Rau*, ECF No. 13, p. 5. Like Wickersham, these two made their

way south through the Crypt, but again, unlike Wickersham, there is no evidence that either Rau

or Jancart were on the front line of the breach of the police line in the Crypt. Unlike Wickersham,

however, Rau and Jancart went upstairs and into the office suite of Speaker Pelosi and had to be

more forcefully guided to an exit by law enforcement. Rau and Jancart spent nearly forty minutes

inside the Capitol. *Id.* at pp. 6-8. Wickersham, as discussed, stayed on the first floor, spent just

over twenty minutes in the Capitol, and left largely of his own accord.

The task of balancing sentences of the Capitol riots defendants is difficult, and that

difficulty will only increase as the number of guilty pleas grows. Given that Bustle—whose

conduct was not as severe as Wickersham's—received a sentence of home detention, and Rau and

Jancart—whose conduct was at once comparable in some instances, less severe in others, and more

severe in still others—then at least one thing is clear: Wickersham should *not* receive a sentence

of probation only. As to whether the government would ask for a term of incarceration, this was a

close call. For the reasons above, the government is not requesting incarceration as to Wickersham,

but believes that a term of four months home detention is a sentence that is sufficient but not greater

than is necessary.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is

"only one of several factors that must be weighted and balanced," and the degree of weight is

"firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d

220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the

result that "different district courts may have distinct sentencing philosophies and may emphasize

and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its

own set of facts and circumstances regarding the offense and the offender." *United States v.*

*Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## IV.    <u>Conclusion</u>

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, some of those factors support a sentence of incarceration and some support a more lenient sentence. Balancing these factors, the government recommends that this Court sentence Gary Laird Wickersham to four months of home detention, a three-year term of probation, sixty hours of community service, and $500 in restitution. This sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty because of his behavior, while recognizing his early acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By: _____

SEAN P. MURPHY
Assistant United States Attorney
D.C. Bar No. 1187821
Torre Chardon, Suite 1201
350 Carlos Chardon Ave.
San Juan, PR 00918
787-766-5656
sean.murphy@usdoj.gov